IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHERYL WALKER, as | ) |
| Power of Attorney for CARROLL WALKER, | ) |
| and Individually, | ) |
| 7814 Beechnut Road | ) |
| Capitol Heights, Maryland 20743 | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No.: |
| | ) |
| UBER TECHNOLOGIES, INC | ) |
| 1515 3rd Street | ) |
| San Francisco, California 94158 | ) |
| | ) |
| Serve: Resident Agent | ) |
| CT CORPORATION SYSTEM | ) |
| 1015 15th Street N.W., Suite 1000 | ) |
| Washington, DC 20005 | ) |
| | ) |
| and | ) |
| | ) |
| RASIER, LLC | ) |
| RASIER-DC, LLC | ) |
| 1515 3rd Street | ) |
| San Francisco, California 94158 | ) |
| | ) |
| Serve: Resident Agent | ) |
| CT CORPORATION SYSTEM | ) |
| 1015 15th Street N.W., Suite 1000 | ) |
| Washington, DC 20005 | ) |
| and | ) |
| | ) |
| GEORGE AGREY AYARI | ) |
| 1400 Stateside Drive | ) |
| Silver Spring, Maryland 20903 | ) |
| | ) |
| | ) |
| Defendants. | |

## **COMPLAINT**

Plaintiff, Cheryl Walker, as Power of Attorney for Carroll Walker, and individually, by

and through her undersigned counsel, and hereby files this Complaint against Defendants Uber

Technologies, Inc. ("Uber"), Rasier, LLC and Rasier-DC, LLC ("Rasier"), and George A. Ayari ("Ayari") and in support thereof, state as follows:

## PARTIES

1.      At the time of this incident, Plaintiff Carroll Walker was an adult resident of Prince George's County, Maryland.

2.      Plaintiff Cheryl Walker is an adult resident of Prince George's County, Maryland, and is Carroll Walker's wife.  Since this incident, Cheryl Walker has been granted Power of Attorney for Carroll Walker with the legal authority to bring this action.

3.      Defendant Uber Technologies, Inc. is a foreign corporation that regularly conducts business in and around the District of Columbia.

4.      Defendant Rasier, LLC, also sometimes referred to in corporate registration documents in Washington, D.C. as Rasier-DC, LLC, is a foreign company that regularly conducts business in and around the District of Columbia.

5.      Defendant George A. Ayari resided at 1400 Stateside Dr. Silver Spring, Maryland 20903, in Montgomery County, Maryland, and was operating a motor vehicle in the District of Columbia at the time of this incident.

6.      At all times relevant hereto Defendant Ayari was employed by, was an employee of, and was acting as the agent, apparent agent, and/or servant of Defendant Uber and Defendant Rasier.

7.      At all times relevant hereto Defendant Ayari was acting in the course and the scope of his employment and/or agency relationship with Defendant Uber and Defendant Rasier.

## JURISDICTION AND VENUE

8.      Jurisdiction is vested in this Court pursuant to 28 US Code § 1332(a)(1). The amount in controversy exceeds $75,000, and additionally, the Plaintiffs and Defendant Ayari are citizens of Maryland and Defendants Uber and Rasier are citizens of California.

9.      This Court has personal jurisdiction over the Defendants pursuant to D.C. Code § 13-423 as the tortious act was committed within the District of Columbia and Defendant Uber and Defendant Rasier were at all times relevant actively engaged in, conducted business in, maintained business offices in and actively solicited business in the District of Columbia.

10.     Venue in this court is appropriate insofar as the negligent acts and/or omissions giving rise to the Plaintiff's claims occurred in this jurisdiction.

## FACTS REGARDING THE DEFENDANTS

11.     As of March 18, 2021, and all times material, Defendant Uber Technologies, Inc. was the business entity that owned and operated the Uber mobile application "(Uber App") through its wholly owned subsidiary Rasier, LLC. Hereinafter, Defendant Uber and Defendant Rasier are referred to collectively as the "Uber Defendants".

12.     The Uber Defendants own and operate a car ride, transportation and delivery business service ("Uber") through the Uber App platform.  Uber employs on-demand drivers throughout the United States and many parts of the world.

13.     The only way to access the Uber App product and its delivery or ride services is to download and register on the Uber App, which is free to download and install on a smartphone.

14.     At all material times the Uber Defendants represented to the public, users, consumers, customers, riders, and/ or Uber drivers that for-profit Uber provides a product, service, good, intelligence, software, digital network, and/or technology to the public, users, consumers, customers, riders, and/or Uber drivers.

15.    At all times material, the Uber Defendants are/were the sole designers and distributors who placed the Uber App product into the stream of commerce and e-commerce, retail, digital media, and/or other financial services industries by way of the digital application and/or digital network for sale to, and for use by, members of the public, including consumers, customers, and users.

16.    The Uber Defendants derive revenues and profits from the customers' and drivers' use of the Uber App that the Uber Defendants design and distribute.

17.    The Uber App is a product available for sale to, and use by, members of the public, including consumers, customers, and other users.

18.    The Uber Defendants employ product designers, product managers, and user experience (UX) writers for the Uber App and its related products, services, goods, intelligence, software, digital networks, and/ or technology.

19.    The Uber Defendants designed and distributed the Uber App to facilitate and carry out this business model and to capture revenues and profits.

20.    The Uber Defendants control, have the ability to control, and are in the best position to control any risk or harm the design of the Uber App might cause when put into the stream of commerce.

21.    The Uber Defendants made dangerous and defective design choices when they decided how, when, and with what frequency the Uber App requires the Uber Driver's attention.

22.    The Uber Defendants were also in the best position to protect against any risk of harm caused by those dangerous and defective design choices.

23.    At present, and as of March 18, 2021, the Uber Defendants operate/operated different versions of the Uber App for riders (Uber Customer App) and Uber drivers (Uber Driver App).

24.     At the time of the automobile collision that is the subject of this litigation on March 18, 2021, Defendant Ayari was working as an Uber driver and Carroll Walker was an Uber customer, who was receiving a ride that was being paid for through the Uber App.

25.      The Uber Driver App incorporates numerous additional features, including default navigation guidance and route directions for drivers to follow, as well as various alerts and notifications that come through the Uber App, including ride requests, rider details, changes in rides, payment and tip activity notifications, Uber promotion information, and other time-sensitive notifications.

26.     The Uber Driver App includes Uber GPS navigation directions with sound, including the following features: auto-navigate, route preview, night mode, lane guidance, voice navigation, and on-route traffic.

27.     The Uber Defendants knew and/or should have known that these route directions were often unreliable and would cause confusion to the drivers that use them.

28.     The Uber website acknowledges this defect, noting that "The Driver app will sometimes suggest a route with inaccurate directions" and offers Uber drivers a platform to make suggested changes to improve the app experience.

29.     The Uber App displays the Uber route directions in the Uber Customer App and the Uber Driver App throughout the ride. Those Uber directions show the estimated time of arrival based on the Uber navigation route and real-time traffic data.

30.     The Uber App's navigation directions display the route that the Uber Defendants calculate as the most efficient and which is the basis of the fare charged through the App. This fare is displayed prior to the customer confirming the ride. The fare does not change once the ride has been confirmed so the customer knows what fare they will be paying regardless of any changes in

traffic. Uber Customers expect that this is the route which will be followed, and Uber Drivers understand this expectation and therefore strictly follow the Uber navigation route displayed.

31.    Uber drivers do not stray from the route displayed by the App and rely on the Uber-provided directions. The drivers are often not familiar with the routes for which they accept trips and instead rely on the Uber App directions. If a driver were to take another route that took longer or was a further distance, the fare would not adjust, and customers would be upset. Therefore, drivers strictly follow the App's directions.

32.    When customers download the Uber App, they register with Uber and can request or provide Uber rides in cities and towns or along almost any street all over the world. Only registered users can use the Uber App to arrange or provide transportation services.

33.    Uber's revenue results from fares paid by its customers for rides provided by Uber's drivers through the Uber App.

34.    To control costs and profitability, the Uber Defendants control almost all aspects of a customer's Uber ride.

35.    The Uber Defendants are in exclusive control of who can use the Uber App as a driver or as a customer.

36.    The Uber Defendants screen, approve, monitor, and retain drivers to provide their on-demand ride services.

37.    When customers request an Uber ride, they use the Uber App to inform the Uber Defendants where and when they would like to travel.

38.    The Uber Defendants then use the Uber App to connect customers requesting a ride to a pre-screened and approved Uber driver who is signed in to work at the time of the request and can complete the trip as planned.

39.    The Uber Defendants require Uber drivers, as they did with Defendant Ayari, to use a smartphone or similar electronic device when providing rides to Uber customers and to have the Uber App open on their smartphones or similar devices to be notified of ride requests, accept work, perform ride services, and generally be actively working for Uber.

40.    The Uber Defendants control which customers are assigned to which Uber drivers and control which Uber drivers can accept a particular customer request through the Uber App.

41.    Uber drivers are not permitted to pick up any Uber customers/riders that are not assigned to them through the Uber App or pick up any potential fares from other transportation companies while they are logged into the Uber App.

42.    Additionally, Uber drivers are not permitted to have friends or family in the vehicle with them unless they are Uber customers.

43.    The Uber Defendants control the timeframe, which is 15 seconds, within which an Uber driver must accept a ride request. If the Uber driver does not accept within the predetermined 15-second timeframe, the Uber App will not permit the driver to accept the ride.

44.    The Uber Defendants also control the timeframe an Uber driver, such as Defendant Ayari, has to travel to the rider's location after accepting the ride request.

45.    The Uber Defendants allow customers to cancel ride requests if the Uber driver does not accept a request or arrive promptly and, if canceled, the Uber driver and the Uber Defendants will lose the potential fare.

46.    Once the Uber Defendants connect a driver with a customer, the Uber App provides customers with the name of the driver, the license plate number, and phone number of the assigned Uber driver.

47.    Uber customers must only use their assigned Uber driver or have the Uber Defendants assign them another one to complete their trip.

48.     The Uber Defendants monitor the acceptance rates of Uber drivers on the Uber App.

49.     The Uber Defendants provide added privileges and benefits to Uber drivers who maintain an acceptance rate of over 85%.

50.     At all times material, the Uber Defendants communicated directly with Uber drivers, including Defendant Ayari, by sending electronic messages, alerts, and notifications through the open Uber App on their smartphones.

51.     The Uber Defendants' electronic messaging to and from Uber drivers includes items such as location, availability for passenger pickup, location of pick up, time for pick up, navigation routes, drop off locations, fares, payment information, and ratings of passenger users.

52.     The Uber Defendants' electronic messages, which are frequently time-sensitive, such as notifications to pick up subsequent riders, and receipt of payment or tips often arrive while Uber drivers are actively driving their vehicles, including while transporting current Uber customers.

53.     The Uber Defendants' electronic messages and notifications were designed to "pop up" in the Uber App as the Uber drivers had it open, including when the Uber drivers were actively driving Uber customers to their destinations.

54.     The Uber Defendants incentivize Uber drivers to monitor and respond to notifications in their Uber App while driving and completing other trips with customers by offering promotions for accepting and completing consecutive rides and other similar tasks or requests, as well as by monitoring the acceptance rates of Uber drivers and providing privileges and benefits to those with the highest acceptance rates.

55.     At all times material, all Defendants were aware of the dangers of the Uber App and knew or should have known how distracting and dangerous it is to send notifications to Uber

drivers and allow Uber drivers to access and respond to the messages and notifications while operating their vehicles, particularly while transporting Uber customers.

56.     At all times material, all Defendants knew or should have known that D.C. Code §50-1731.01, et seq. is a prohibition on distracted driving and restricts the use of mobile telephone and other electronic devices while driving. D.C. Code §50–1731.02(1). D.C. Code §50–1731.01 et seq. was implemented to protect individuals using or near the roadways from sustaining injuries or death due to inattentive or distracted drivers.

57.     The District of Columbia specifically passed this law to prohibit distracted driving, which is defined as "inattentive driving while operating a motor vehicle that results in the unsafe operation of the vehicle where such inattention is caused by reading, writing, … using personal communications technologies, or engaging in any other activity which causes distractions."

58.     At all times material, all Defendants knew or should have known that operating a smartphone and reading, viewing, hearing, and/ or responding to notifications or messages while operating a motor vehicle is inherently dangerous and in the District of Columbia is a violation of D.C. Code §50-1731.01, et seq.

59.     The dangerous and defective design of the Uber App has caused serious injuries and deaths in the past due to similar activity and the Uber Defendants were aware of such incidents.

60.     The Uber Defendants have made efforts to conceal and obscure past incidents similar to the one that is the subject of this lawsuit.

61.     The Uber Defendants solely dictate the ride fee to each Uber customer based on a number of proprietary factors determined to be relevant to the trip cost using a proprietary formula/algorithm.

62.     The proprietary factors used in the Uber Defendants' fee setting formula/algorithm include but are not limited to: 1) distance, 2) traffic along the route, 3) level of demand of other

customers at the time of the requested trip, and 4) the number of Uber drivers available at that time of the requested trip.

63.     As each Uber ride commences, the Uber App shows the Uber customer and the Uber driver the route directions for the trip that has been designed by the Uber Defendants in the Uber App.

64.     Uber drivers follow the route directions while driving and customers monitor the trip progress on their smartphone along the Uber navigation route in the Uber App.

65.     Upon completion of the trip, the Uber Defendants dictate that customers may only pay for the Uber ride, including providing any tips, directly through the Uber App and are not allowed to give any payment or tip money directly to the Uber driver.

66.     The Uber Defendants control the percentage of fares paid to Uber drivers, as well as when and through what method the Uber drivers can receive payment, such as through direct deposit after they collect the fares from the customers through the Uber App.

67.     The Uber Defendants keep the other percentage of the fares collected for themselves as revenue.

68.     Uber drivers do not have the authority to retroactively adjust a fare. For an Uber driver to adjust a fare, they must request that the Uber Defendants do so at their discretion.

69.     If the Uber App's technology malfunctions, Uber drivers are not allowed to accept cash payments from passengers and the Uber drivers must ask the Uber Defendants for reimbursement.

70.     The Uber Defendants control how Uber customers and Uber drivers connect before or after the trip for any reason and dictate that all connections must be through the Uber App.

71.     The Uber Defendants exercise, and/or have contractual rights to exercise, significant control over Uber drivers, including Defendant Ayari.

72.     This contractual right to exercise control includes but is not limited to, unilaterally setting the rates charged, unilaterally determining the portion of the payment remitted to drivers to compensate them for their services, unilaterally requiring drivers to comply with their policies regarding personal conduct and vehicle maintenance, and unilaterally prohibiting drivers from soliciting rides from customers who do not use the Uber app.

73.     This contractual right to exercise control also includes the ability to control the time, manner, method, and performance of Defendant Ayari's employment and/or work.

74.     Through several forms of media, the Uber Defendants represent to consumers, including specifically to consumers in the District of Columbia Metropolitan Area (DCMA), that they subject Uber drivers to rigorous screening procedures before allowing them to drive for Uber. For example, the Uber website states the following:

> Everyone who drives with Uber is screened before their first trip. In addition, Uber reruns these driver screenings every year and uses technology to look for issues in between.[1]

75.     The Uber Defendants represent to consumers (including consumers in the DCMA) that they monitor the quality of Uber drivers on an ongoing basis through a rating system.

76.     The Uber Defendants unilaterally maintain the right to remove an "Uber driver's" authorization if they determine that the Uber driver is not qualified to drive for Uber or has violated Uber's Community Guidelines.

77.     The Uber Defendants unilaterally maintain the right to require drivers to attend quality improvement courses to regain Uber driving authorization following a suspension by the Uber Defendants under certain circumstances. These courses are scheduled and sometimes offered through the Uber website.

---

[1] https://www.uber.com/us/en/ride/safety/driver-screening/

78.    Upon threat of termination, the Uber Defendants subject Uber drivers to many specific requirements concerning the performance of their driving duties, including, but not limited to the following:

    a.  Drivers must utilize the Uber App;

    b.  Drivers must maintain their vehicles in "great" mechanical condition;

    c.  Drivers must maintain their cars in an acceptable clean condition;

    d.  Drivers are required to maintain certain items, such as a phone mount, and are prohibited from having certain items, such as firearms, in their vehicles when driving for Uber;

    e.  Drivers must maintain a ride request acceptance rate that is acceptable to Uber;

    f.  Drivers must respond to ride requests within a timeframe that is acceptable to Uber;

    g.  Drivers must not call passengers who have requested a ride with a frequency that Uber determines is "excessive"; and

    h.  Drivers must display the Uber logo on their vehicles.

79.    Uber provides an "Uber emblem" to its drivers as Uber's official trade dress to be displayed in the vehicles to help passengers, the public, and law enforcement identify Uber vehicles driven by Uber drivers.

80.    The Uber Defendants operate Greenlight Hubs in the DCMA for Uber drivers, like Defendant Ayari, to get in-person attention, answers to questions, assistance resolving issues, and access to a network of fellow drivers.

81.    At all material times, including specifically at the time of the subject motor vehicle collision, Defendant Ayari was using the Uber App on his smartphone before and during the collision giving rise to this lawsuit.

82.     At all material times, including specifically at the time of the subject motor vehicle collision and the driving decisions made leading up to the collision, Defendant Ayari was distracted, deceived, misled, and/or confused by the Uber App on his smartphone while driving.

83.     At all material times, the Uber Defendants were communicating directly with Defendant Ayari through the Uber App by providing electronic messaging to and from Defendant Ayari, including ride notifications, pickup requests, navigation route directions, driver location, availability for passenger pickup, location of pick up, time for pick up, drop off locations, fares, payment information, and ratings of passenger users, which it knew could lead to distraction, confusion, deception, or misdirection and causes collisions, such as the motor vehicle collision that is the subject of this lawsuit.

84.     The Uber App is designed to condition and incentivize drivers to respond to time-sensitive notifications immediately by tracking and providing additional monetary rewards to drivers who maintain a high rate of accepting ride notifications, which require a response within fifteen (15) seconds.

85.     At all material times, Defendant Ayari was the agent, employee, and/or apparent agent of the Uber Defendants and was acting as the agent, employee, and/or apparent agent of the Uber Defendants, which consciously and/or impliedly represented Defendant Ayari to be their agent or employee.

86.     At all material times, the Uber Defendants acted by and through their employees, agents, apparent agents, servants, officers, partners, joint venturers, and representatives, including Defendant Ayari, who were acting within the course of their employment, agency, apparent agency, servitude, office, partnership, joint venture, and representative capacity, or under the Uber Defendants' control or right of control, and in furtherance of the Uber Defendants' interests, thereby making the Uber Defendants vicariously liable for their acts and omissions.

87.     At all material times, Defendant Ayari was hired, approved, and authorized by the Uber Defendants to operate as an Uber driver through the Uber App and provide transportation services in exchange for monetary gain for all Defendants and in furtherance of the Uber Defendants' interests, including profit and financial gain.

88.     At all material times, Defendant Ayari was using the Uber App in substantially the way that the Uber Defendants intended the Uber App to be used.

89.     At all material times, the Uber Defendants did control and/or knew that they had the ability to control Defendant Ayari's actions while working for Uber.

90.     At all material times, the Uber Defendants controlled Defendant Ayari's actions while he was working for Uber.

## FACTS REGARDING THE CRASH

91.     On March 18, 2021 Plaintiff Carroll Walker's wife, Cheryl Walker, ordered Carroll a ride home through the Uber App.

92.     Plaintiff Carroll Walker was picked up by Uber and was a rear-seat passenger in a Chevy Captiva vehicle owned and/or operated by Defendant Ayari and Uber.

93.     The Plaintiffs understood Mr. Ayari to be an employee of Uber or at a minimum their agent.

94.     At all times material, Defendant Ayari was held out to the Plaintiffs by the Uber Defendants as their employee and/or their apparent agent and was acting within the scope of an employer-employee and/or agency or apparent agency relationship.

95.     At all times material, Defendant Ayari was the Uber driver assigned by the Uber Defendants through the Uber App to drive Plaintiff Carroll Walker on his Uber ride.

96.     On March 18, 2021, Defendant Ayari picked Plaintiff Carroll Walker up and drove Carroll in the back seat of Defendant Ayari's vehicle with the intent to transport Carroll pursuant to the Uber App request from Plaintiff Cheryl Walker.

97.     At all times material, Defendant Ayari was operating his vehicle with the Uber Defendants' consent, permission, and instruction.

98.     At all times material, Defendant Ayari was acting within the course and scope of an employee/employer relationship and/or his employment contract/agreement and/or his agency relationship with the Uber Defendants.

99.     At all times material, the Uber Defendants had the right to control the time and manner in which Defendant Ayari executed and performed his job duties of driving Plaintiff Carroll Walker to his destination.

100.    At all times material, Defendant Ayari's work of driving Plaintiff Carroll Walker to his destination was under the immediate direction and control of the Uber Defendants.

101.    At all times material, including after picking up Plaintiff Carroll Walker and through the time of the automobile collision giving rise to this lawsuit, Defendant Ayari was utilizing the Uber Driver App on his smartphone while operating his motor vehicle.

102.    The Uber Defendants provided Defendant Ayari with Uber navigation, including route directions, through the Uber Driver App for use during Plaintiff Carroll Walker's Uber ride.

103.    Defendant Ayari utilized this default Uber navigation, including route directions, as he drove Plaintiff Carroll Walker on the way to his home.

104.    The Uber Defendants knew that the default Uber navigation, including route directions, was often unreliable and caused confusion to Uber drivers during their rides.

105.    At all times material, all Defendants were aware of the dangers of the Uber App Uber Navigation directions and knew or should have known how distracting, misleading, and

confusing it is to send incorrect, misleading, or deceptive instructions and directions to Uber drivers while operating their vehicles, particularly while transporting Uber customers.

106.    The Uber navigation route directions provided to Defendant Ayari were not in accordance with local traffic rules and regulations and caused Defendant Ayari to become confused and distracted while driving.

107.    The Uber navigation route directions provided to Cheryl Walker for purposes of guiding the ride, calculating the fare, and directing Defendant Ayari as he completed the trip, appeared to have instructed Defendant Ayari to drive illegally into oncoming traffic down the wrong way on the roadway and to later make an illegal left-hand turn.

108.    The illegal left-hand turn was to be made almost immediately after the location where the collision occurred, at the time when Defendant Ayari was supposed to navigate from Maine Avenue onto Raoul Wallenberg Place.

109.    Maine Avenue is a divided highway with a grassy median in the middle of one-way sets of two lanes each where the collision occurred, which are the roadway conditions for a significant stretch before and after the collision location.

110.    The Uber Navigation route directed Ayari to travel the wrong way into oncoming traffic on Maine Avenue, which would have been the only physically possible way to then make the illegal left hand turn due to the physical layout of the roadway.

111.    Defendant Ayari was in fact traveling in the wrong direction on Maine Avenue at the time of the collision, and prior to where the Uber GPS was instructing him to make the illegal left on to Raoul Wallenberg Place.

112.    The Uber Defendants negligently directed Defendant Ayari to follow the Uber Navigation that directed him to travel on the wrong side of the road, resulting in significant harm to Plaintiff Carroll Walker, as described later in this complaint.

113.    Defendant Ayari was obeying the Uber Navigation directions provided by the Uber Defendants when the collision occurred, resulting in significant harm to Plaintiff Carroll Walker.

114.    The Uber Defendants sent time-sensitive notifications and electronic messages to Defendant Ayari through the Uber Driver App while he was operating his vehicle and/or dictated that Defendant Ayari have his Uber App open to be able to receive these time-sensitive messages, thereby distracting his driving.

115.    Defendant Ayari, like all Uber drivers, was financially incentivized to pay attention to these notifications and messages as well as timely respond to them based on Uber's time-sensitive response rules and incentivization to drivers' active replies.

116.    Defendant Ayari followed the route given to him by the Uber App, causing him to make a wrong turn into the oncoming lanes of travel on Maine Avenue, S.W.

117.    In the moments before he made that wrong turn, Defendant Ayari was distracted, confused, and/or misled by the Uber App on his smartphone while driving.

118.    In the moments before he made an illegal, wrong or misdirected turn into the on-coming lanes of travel on Maine Avenue, Defendant Ayari was distracted, confused, deceived, directed and/or misled by the electronic notifications and communications to and from the Uber App on his smartphone while driving, including the Uber navigation route directions, and as a result he drove down a one-way roadway the wrong way.

119.    In the moments before the subject automobile collision, Defendant Ayari was distracted, confused, directed, deceived and/or misled by the electronic notifications and communications to and from the Uber App on his smartphone while driving, including the Uber navigation route directions, and as a result he drove down a one-way roadway the wrong way.

120.    In the moments before Defendant Ayari made an illegal turn and before the subject automobile collision, the navigation directions provided by the Uber Defendants through the Uber

Driver App did not follow the traffic rules of Washington, D.C., and either directed Defendant Ayari to drive on the wrong side of the road or were confusing, distracting, deceiving and/or misleading enough to Defendant Ayari that he ended up driving on the wrong side of the road, causing the accident to occur.

121.    Leading up to and at the time of the subject incident, Defendant Ayari was talking on a second cell phone, which added to his confusion and distraction.

122.    Uber knew or should have known that their drivers including Ayari would also use a second electronic device for personal communications as they are in the car for hours at a time driving for Uber.

123.    Drivers including Ayari must keep their phones with the Uber App open and displayed throughout the ride so that they can follow Uber's navigation directions.

124.    At the time of the subject incident, Defendant Ayari was traveling the wrong way (going eastbound) in the westbound lanes on Maine Avenue, S.W. in Washington, D.C. with Plaintiff Carroll Walker as his passenger in the vehicle's backseat.

125.    At the same time and place as when Defendant Ayari was traveling the wrong way (going eastbound) in the westbound lanes on Maine Avenue, Cheryl A. Fords was operating an Infiniti QX60 traveling westbound on Maine Avenue S.W. in Washington, District of Columbia when Defendant Ayari struck Ms. Ford's vehicle head-on.

126.    At the same time and place as when Defendant Ayari was traveling the wrong way (going eastbound) in the westbound lanes on Maine Avenue, Leora Childress was operating a Toyota Rav4 traveling westbound on Maine Avenue, S.W. in Washington, District of Columbia when Defendant Ayari struck the Toyota Rav4 head-on.

127.    The force of the multiple impacts resulted in vehicle intrusion and airbag and curtain deployment in Defendant Ayari's vehicle.

## PHYSICAL AND MENTAL INJURIES TO PLAINTIFF AS A RESULT OF THE CRASH

128.    Plaintiff Carroll Walker, who was sitting in the back seat of Defendant Ayari's vehicle at the time of the collision, sustained catastrophic physical injuries as a result of the collision and was transported from the scene to George Washington University Hospital (GWUH) where he was admitted to the intensive care unit (ICU) for treatment of polytrauma, including, but not limited to, fractures of the C7 right transverse process, T7 vertebral body, L1 left transverse process, left 4th, 5th, 6th, 8th, 20th ribs, right 1st rib, left humerus, and severe distal femur fractures bilaterally (open and closed). He was also diagnosed with a brain injury. He also suffered from multiple other related medical complications from the crash, all of which combined to be life-threatening.

129.    Mr. Walker remained inpatient at GWUH for 26 days where he remained intubated due to the multiple staged orthopedic procedures that were required, including the operative closure of the right tibia wound, the irrigation and debridement of the open right distal femur wound with multiplanar external fixators placed on the bilateral femur fractures, the open reduction internal fixation of the left femur with intramedullary nail placement and tracheostomy placement, and the open reduction internal fixation of the right femur with percutaneous gastrostomy tube placement.

130.    Since Mr. Walker was initially stabilized at GWUH, his life has been a revolving door of hospitals and skilled nursing facilities including stays at Bridgepoint Capitol Hill Hospital, United Medical Center, Bridgepoint National Harbor Hospital, Washington Hospital Center, Howard Hospital, INOVA Fairfax Hospital, Sibley Memorial Hospital, and return trips and inpatient stays at GWUH.

131.    His subsequent hospitalizations have been for a series of causally related complications including, but not limited to, sepsis, septic shock, urosepsis, UTIs, altered mental status, ureteral obstruction, pressure ulcers, and sacral ulcers.

132.    Mr. Walker has never left the bed to this day as a result of these injuries and has suffered from regular pressure wounds that have necessitated multiple debridement procedures, almost constant wound care, and he has experienced extensive muscle atrophy and general deconditioning.

133.    As a result of these injuries, he has also suffered encephalopathy, multiple infections, deconditioning and critical illness polyneuropathy/myopathy.

134.    Mr. Walker has primarily been an in-patient at Bridgepoint Sub-Acute & Rehab National Harbor skilled nursing floor, where he received around-the-clock care and treatment with medical equipment necessary to survive, including an orogastric tube, an intravenous catheter, a foley catheter, an endotracheal tube, a gastrostomy tube, a peripherally inserted central catheter, a rectal tube, a midline catheter, tracheostomy, and mechanical ventilation, among other medical care, treatment and support.

135.    On March 9, March 14, and March 17, 2023, after almost two years of constant unresolved severe pain due to orthopedic hardware failure in both of his legs and osteomyelitis, Mr. Walker was left with no choice but to follow medical advice and undergo bilateral above-the-knee leg amputations in multiple staged surgeries at GWUH due to these severe complications, which were life-threatening.

136.    Mr. Walker remained in-patient at GWUH for 28 days during this admission before being transferred back to Bridgepoint.

137.    Mr. Walker's necessary future medical care includes a significant number of additional procedures, specialized rehabilitation services, orthopedic prosthetics, and related and attendant care.  He will never be able to live independently again.

138.    Mr. Walker suffers from permanent emotional trauma and psychological effects of the event and the resulting devastating injuries to his mind and body.

139.    Mr. Walker's related medical bills are approximately $4.5 million and are rising each day and will continue to accrue.

140.    The aforementioned collision and resultant injuries were the proximate result of the negligent conduct of each of the Defendants.

141.    At all times relevant, Plaintiff was free of any contributory negligence as to the cause of the accident and the injuries sustained. Likewise, Plaintiff did not assume the risk of injury and has not failed to mitigate any of his damages.

## COUNT I
### Negligence
Carroll Walker v. George Ayari

142.    Plaintiff re-pleads and incorporates by reference paragraphs No. 1 through paragraph No. 141 of this Complaint fully as if the allegations were set forth fully herein and further states:

143.    This collision was caused by Defendant Ayari's negligence while operating a motor vehicle in which Plaintiff Carroll Walker was a passenger.

144.    Defendant Ayari had a duty of care to Plaintiff Carroll Walker to operate the motor vehicle Defendant Ayari was driving in a reasonable, prudent, and safe manner.

145.    Defendant Ayari was negligent and breached his duties of care by:

   a.   Driving against the direction of traffic;

b.  failing to maintain control of the vehicle within his lane of travel;

c.  failing to use reasonable care when operating a motor vehicle;

d.  failing to obey traffic laws;

e.  failing to safely operate the vehicle at a reasonable rate of speed;

f.  failing to operate the vehicle in accordance with the Rules of the Road;

g.  failing to avoid injuring passengers;

h.  failing to watch the road while driving to prevent harm or death to others;

i.  failing to obey all traffic control devices, including one-way signs, to prevent serious harm or death to others;

j.  failing to pay full time and attention to the operation of his motor vehicle to prevent serious harm or death to others;

k.  engaging in a cell phone conversation which distracted him from the safe, reasonable, and prudent operation of his motor vehicle;

l.  operating a cellular phone and responding to messages through his Uber App while driving, in violation of D.C. Code §50–1731.04; and

m. failing to generally operate the vehicle in a safe, reasonable, and prudent manner.

146.    The negligent actions of Defendant Ayari described above were a direct and proximate cause of the subject collision and the damages pled below.

## COUNT II

### Negligence - Respondeat Superior

Carroll Walker v. Uber Technologies, Inc. and Rasier, LLC

147.    Plaintiff re-pleads and incorporates by reference paragraphs No. 1 through No. 146 of this Complaint fully as if the allegations were set forth fully herein and further states:

148.    That at all times relevant, Defendant Ayari was employed by the Uber Defendants and/or acting as their agent, servant, and/or apparent agent.

149.    At all times relevant, Defendant Ayari, an employee and/or agent was acting in the scope of his employment and/or agency relationship in furtherance of the business interests of Defendant Uber and Defendant Rasier.

150.    At all times relevant, Defendant Uber, Defendant Rasier, and Defendant Ayari represented to the public and the Plaintiff that Defendant Ayari was a driver and agent of Uber, and Plaintiffs reasonably relied on these representations to utilize Uber's transportation service.

151.    At all times relevant, Defendant Uber, Defendant Rasier, and Defendant Ayari represented to the public and the Plaintiff that Defendant Ayari was a driver and agent of Uber through means including, but not limited to, the following:

      a.    the ability to be connected through the Uber app,

      b.    controlling which drivers and passengers could be connected with each other,

      c.    the display of the license plate number of Defendant Ayari's vehicle only through the Uber App to the Plaintiff,

      d.    controlling the method of payment between Defendant Ayari and the Plaintiff,

      e.    controlling the route Defendant Ayari and the Plaintiff were expected to travel,

      f.    controlling the cost of the services Defendant Ayari was providing to the Plaintiff,

g.  controlling the method of contact between Plaintiff and Defendant Ayari before and after the trip,

h.  regulating the type of vehicle Defendant Ayari could drive,

i.  regulating the condition of the vehicle and items Defendant Ayari needed and could not have in the vehicle, and

j.  providing Defendant Ayari and the plaintiff with driving directions while transporting Plaintiff Carroll Walker.

152.    As the principals for Defendant Ayari, Defendant Uber and Defendant Rasier are liable for the negligent acts committed by their employee and/or agent, Defendant Ayari.

153.    As delineated above in Cout I of this complaint, Defendant Ayari had a duty of care to Plaintiff Carroll Walker to operate the motor vehicle Defendant Ayari was driving in a reasonable, prudent, and safe manner.

154.    As delineated above in Count I of this complaint, Defendant Ayari committed the following breaches of his duties of care:

a.  driving against the direction of traffic;

b.  failing to maintain control of the vehicle within his lane of travel;

c.  failing to use reasonable care when operating a motor vehicle;

d.  failing to obey traffic laws;

e.  failing to safely operate the vehicle at a reasonable rate of speed;

f.  failing to operate the vehicle in accordance with the Rules of the Road;

g.  failing to avoid injuring passengers;

h.  failing to watch the road while driving to prevent harm or death to others;

i.  failing to obey all traffic control devices, including one-way signs, to prevent serious harm or death to others;

j.   failing to pay full time and attention to the operation of his motor vehicle to prevent serious harm or death to others;

k.   engaging in a cell phone conversation which distracted him from the safe, reasonable, and prudent operation of his motor vehicle;

l.   operating a cellular phone and responding to messages through his Uber App while driving, in violation of D.C. Code §50–1731.04; and

m.   failing to generally operate the vehicle in a safe, reasonable, and prudent manner.

155.   The negligent actions of the Uber Defendants' employee/agent Defendant Ayari described above were a direct and proximate cause of the subject collision and the damages pled below.

## COUNT III

### Negligence - Apparent Agency

Carroll Walker v. Uber Technologies, Inc. and Rasier, LLC

156.   Plaintiff re-pleads and incorporates by reference paragraphs No. 1 through No. 155 of this Complaint fully as if the allegations were set forth fully herein and further states:

157.   At all times relevant, Defendant Ayari was joined in a business enterprise for mutual profit with the Uber Defendants.

158.   Plaintiff Carroll Walker's ride with Defendant Ayari was booked through the Uber Defendants' Uber mobile app.

159.   The Uber Defendants caused, by representations and/or actions, including those listed above and below, the Plaintiffs to believe that Defendant Ayari was the principal's agent.

160.    At all times relevant, Defendant Uber, Defendant Rasier, and Defendant Ayari represented to the public and the Plaintiff that Defendant Ayari was a driver and agent of Uber through means including, but not limited to:

    a.  Plaintiffs were provided with the license plate number and vehicle information of Defendant Ayari's vehicle through the Uber mobile app to the Plaintiff,

    b.  Plaintiffs were required to use the Uber mobile app to contact Defendant Ayari before or after the trip and to pay Defendant Ayari for the services he rendered,

    c.  Plaintiffs were required to pay Defendant Ayari the amount set by the Uber Defendants through the Uber App,

    d.  Plaintiffs were provided route directions through the Uber App that Defendant Ayari would be using to complete the trip,

    e.  Defendant Ayari utilized driving directions provided by the Uber Defendants while driving Plaintiff Carroll Walker,

    f.  Defendant Ayari was required to have Defendant Uber's logo visibly displayed on his vehicle when he picked up Plaintiff Carroll Walker,

    g.  The Uber Defendants were regulating the type of vehicle Defendant Ayari could drive, the condition of the vehicle, and items Defendant Ayari needed and could not have in the vehicle,

    h.  The Uber Defendants controlling the method of contact between Plaintiff and Defendant Ayari before and after the trip,

    i.  The Uber Defendants, through the Uber website, marketing, and Uber App, represented to Plaintiff and other customers that it subjects its drivers to rigorous screening procedures before hiring them,

j. The Uber Defendants, through the Uber website, marketing, and Uber App, represented to Plaintiff and other customers that it continues to monitor its drivers after they are hired.

k. The Uber Defendants, through their advertising campaigns, blogs, and official communications across various types of media, represented to their customers, including the Plaintiffs, that Uber drivers are agents of the Uber Defendants and that their care and skill are carefully vetted on both an up-front and ongoing basis.

161.    In reasonable reliance upon these representations, the Plaintiff justifiably relied upon the care and skill of Defendant Ayari as the apparent agent of the Uber Defendants to the Plaintiff's detriment.

162.    The plaintiffs' reliance on the Uber Defendants' representations was reasonably justified.

163.    As the apparent principal for Defendant Ayari, the Uber Defendants are liable for the negligent acts committed by their apparent agent, Defendant Ayari.

164.    As delineated above in Cout I of this complaint, Defendant Ayari had a duty of care to Plaintiff Carroll Walker to operate the motor vehicle Defendant Ayari was driving in a reasonable, prudent, and safe manner.

165.    As delineated in Count I of this complaint, Defendant Ayari committed the following breaches of his duties of care:

a. driving against the direction of traffic;

b. failing to maintain control of the vehicle within his lane of travel;

c. failing to use reasonable care when operating a motor vehicle;

d. failing to obey traffic laws;

e. failing to safely operate the vehicle at a reasonable rate of speed;

f.   failing to operate the vehicle in accordance with the Rules of the Road;

g.   failing to avoid injuring passengers;

h.   failing to watch the road while driving to prevent harm or death to others;

i.   failing to obey all traffic control devices, including one-way signs, to prevent serious harm or death to others;

j.   failing to pay full time and attention to the operation of his motor vehicle to prevent serious harm or death to others;

k.   engaging in a cell phone conversation which distracted him from the safe, reasonable, and prudent operation of his motor vehicle;

l.   operating a cellular phone and responding to messages through his Uber App while driving, in violation of D.C. Code §50–1731.01 et seq.; and

m.   failing to generally operate the vehicle in a safe, reasonable, and prudent manner.

166.   The reasonable reliance of the Plaintiff on the Uber Defendant's representations that Defendant Ayari was their agent and Defendant Ayari's subsequent negligent actions were direct and proximate causes of the subject collision and the damages pled below.

## COUNT IV
### Negligence – Distraction of Driver
Carroll Walker v. Uber Technologies, Inc. and Rasier, LLC

167.   Plaintiff re-pleads and incorporates by reference paragraphs No. 1 through No. 166 of this Complaint fully as if the allegations were set forth fully herein and further states:

168.   As Plaintiff Carroll Walker's Uber ride commenced, the Uber Defendants required that Defendant Ayari keep the Uber App open as he drove Plaintiff Carroll Walker home.

169.    The Uber Defendants' Uber App negligently distracts drivers, as described above and in later counts of this complaint, by providing time-sensitive pop-up notifications and incentivizing the Uber Drivers to promptly respond to these notifications.

170.    The Uber Defendants negligently directed Defendant Ayari to keep the Uber App open during the ride and to follow their directions which resulted in Ayari being distracted, misled, deceived and/or confused while driving, causing his wrong turns.

171.    Defendant Ayari was obeying Uber App's  instructions and the Uber Defendants' requirements at the time of the collision which resulted in serious harm to Plaintiff Carroll Walker.

172.    The instructions provided by the Uber Defendants caused Defendant Ayari to be distracted, misled, and/or confused and therefore commit the following breaches of his duties of care:

    a.   driving against the direction of traffic;

    b.   failing to maintain control of the vehicle within his lane of travel;

    c.   failing to use reasonable care when operating a motor vehicle;

    d.   failing to obey traffic laws;

    e.   failing to safely operate the vehicle at a reasonable rate of speed;

    f.   failing to operate the vehicle in accordance with the Rules of the Road;

    g.   failing to avoid injuring passengers;

    h.   failing to watch the road while driving to prevent harm or death to others;

    i.   failing to obey all traffic control devices, including one-way signs, to prevent serious harm or death to others;

    j.   operating a cellular phone and responding to messages through his Uber App while driving, in violation of D.C. Code §50–1731.01 et seq.;

k.  failing to pay full time and attention to the operation of his motor vehicle to prevent serious harm or death to others; and

l.  failing to generally operate the vehicle in a safe, reasonable, and prudent manner.

173.  By distracting, deceiving, misleading, and/or confusing Defendant Ayari, the Uber Defendants committed the following breaches of their duties of care:

a.  In distracting, deceiving, misleading and/or confusing Defendant Ayari while operating his motor vehicle;

b.  In promoting and/or allowing distracted driving and/or reckless driving by sending notifications to Defendant Ayari he was operating a motor vehicle and requiring Uber drivers such as Defendant Ayari to respond to customers' requests for driving services in a limited period of time;

c.  In promoting and/or allowing Uber drivers, including Defendant Ayari, to drive while distracted or otherwise unfit to safely drive;

d.  In causing Defendant Ayari to break traffic laws while operating his motor vehicle;

e.  In providing unsafe distraction during the Plaintiff's Uber ride;

f.  In distracting or confusing Defendant Ayari which caused him to operate his vehicle against applicable traffic laws and regulations;

g.  In distracting or confusing Defendant Ayari which caused him to operate his vehicle not in accordance with the Rules of the Road;

h.  In causing Defendant Ayari to generally operate his motor vehicle in an unsafe, unreasonable, and not prudent manner;

i.  In designing, manufacturing, assembling, specifying, and/or installing the Uber app in a manner that caused Defendant Ayari and other Uber drivers to operate a cellular

phone and respond to messages through his Uber App while driving, in violation of D.C. Code §50–1731.01 et seq.;

j.   In failing to provide reasonable protection to Uber App users by failing to comply with the standards of care applicable in the software, technology, intelligence, and transportation industries;

k.   In marketing and advertising the Uber App as safe and in such a manner as to misrepresent and mislead consumers and users as to the safety of the Uber App and/or transportation services purchased through the Uber App;

l.   In hiding and/or concealing from the general public the safety problems and issues Uber knew about regarding the Uber App and/or transportation services purchased through the Uber App;

m.  In such other particulars that may be established through discovery or at the trial of this action.

174.   The negligent distraction caused by the Uber App was a direct and proximate cause of the subject collision and the damages pled below.


## COUNT V
### Negligence – Improper Direction
Carroll Walker v. Uber Technologies, Inc. and Rasier, LLC

175.   Plaintiff re-pleads and incorporates by reference paragraphs No. 1 through No. 174 of this Complaint fully as if the allegations were set forth fully herein and further states:

176.   As Plaintiff Carroll Walker's Uber ride commenced, the Uber Defendants provided Defendant Ayari with default navigation, including route directions, through the Uber App to be followed as he drove Plaintiff Carroll Walker home.

177.    The Uber Defendants' navigation and route directions sent through the Uber App did not provide a route for Defendant Ayari to follow that complied with Washington, D.C. traffic rules and regulations.

178.    The Uber Defendants negligently and improperly directed Defendant Ayari to follow the Uber navigation, which was provided to both Defendant Ayari and the customer, and Defendant Ayari's following of these directions resulted in serious harm to Plaintiff Carroll Walker.

179.    Defendant Ayari was obeying these Uber Defendant driving directions at the time of the collision which resulted in serious harm to Plaintiff Carroll Walker.

180.    The default navigation and route directions provided by the Uber Defendants were so inadequate, inaccurate, misleading, and/or confusing that they caused Defendant Ayari to commit the following breaches of his duties of care:

      a.    driving against the direction of traffic;

      b.    failing to maintain control of the vehicle within his lane of travel;

      c.    failing to use reasonable care when operating a motor vehicle;

      d.    failing to obey traffic laws;

      e.    failing to safely operate the vehicle at a reasonable rate of speed;

      f.    failing to operate the vehicle in accordance with the Rules of the Road;

      g.    failing to avoid injuring passengers;

      h.    failing to watch the road while driving to prevent harm or death to others;

      i.    failing to obey all traffic control devices, including one-way signs, to prevent serious harm or death to others;

      j.    operating a cellular phone and responding to messages through his Uber App while driving, in violation of D.C. Code §50–1731.01 et seq.;

    k.   failing to pay full time and attention to the operation of his motor vehicle to prevent serious harm or death to others; and

    l.   failing to generally operate the vehicle in a safe, reasonable, and prudent manner.

181.   By providing inadequate, inaccurate, misleading, and/or confusing driving directions, the Uber Defendants committed the following breaches of their duties of care:

    n.   In distracting, deceiving, misleading and/or confusing Defendant Ayari while operating his motor vehicle;

    o.   In promoting and/or allowing distracted driving and/or reckless driving by sending incorrect and improper directions to Defendant Ayari at all material times, while he was  operating a motor vehicle;

    p.   In promoting and/or allowing Uber drivers, including Defendant Ayari, to drive while directly them negligently or otherwise in a manner unfit to safely drive;

    q.   In directing Defendant Ayari to break traffic laws while operating his motor vehicle;

    r.   In providing unsafe directions during the Plaintiff's Uber ride;

    s.   In providing direction as Defendant Ayari's employer which caused Defendant Ayari to operate his vehicle against applicable traffic laws and regulations;

    t.   In providing direction as Defendant Ayari's employer which caused Defendant Ayari to operate his vehicle not in accordance with the Rules of the Road;

    u.   In causing Defendant Ayari to generally operate his motor vehicle in an unsafe, unreasonable, and not prudent manner;

    v.   In designing, manufacturing, assembling, specifying, and/or installing the Uber app in a manner that caused Defendant Ayari to operate a cellular phone and respond to the Uber App while driving, in violation of D.C. Code §50–1731.01 et seq.;

w.  In failing to recall and/or correct known design, manufacturing, specification, installation, repair, maintenance, and/or servicing defects;

x.  In failing to properly test the safety protections and navigation guidance available in the Uber App and/or for the use of transportation services arranged and paid for through the Uber App;

y.  In failing to provide reasonable protection to Uber App users by failing to comply with the standards of care applicable in the software, technology, intelligence, and transportation industries;

z.  In hiding and/or concealing from the general public the safety problems and issues Uber knew about regarding the Uber App and/or transportation services arranged and paid for through the Uber App;

aa. In such other particulars that may be established through discovery or at the trial of this action.

182.    As a direct and proximate result of the negligence and carelessness of the Defendants, Plaintiff Carroll Walker has suffered and will continue to suffer immense physical pain resulting from serious bodily injuries past, present, and future, which are permanent, mental anguish, emotional distress, past, present, and future medical expenses, past, present and future lost wages and benefits, deformity, disfigurement, as well as past, present, and future inconvenience, and other damages.

183.    The negligent direction given by the Uber Defendants was a direct and proximate cause of the subject collision and the damages pled below.

## COUNT VI

### Strict Liability of Product Manufacturer/Seller for Physical Harm

Carroll Walker v. Uber Technologies, Inc. and Rasier, LLC

184.    Plaintiff re-pleads and incorporates by reference paragraphs No. 1 through No. 183 of this Complaint fully as if the allegations were set forth fully herein and further states:

185.    That at all times relevant, the Uber Defendants owned, operated, designed, and otherwise controlled the Uber App.

186.    At all times relevant, the Uber Defendants owned, operated, designed, and otherwise controlled the electronic notifications, communications, and messages sent to Uber drivers, such as Defendant Ayari, through the Uber App.

187.    At all times relevant, the Uber Defendants know that certain electronic notifications and communications required or incentivized prompt responses, such as notifications of future ride requests.

188.    At all times relevant, the Uber Defendants directed, mandated, and/or incentivized Uber drivers, such as Defendant Ayari to use and keep the Uber App open while driving in the District of Columbia.

189.    At all times relevant, the Uber Defendants were regularly engaged in the business of distributing the Uber App to drivers and regularly engaging in commerce through transactions on the Uber App with both riders and drivers.

190.    The Uber Defendants distributed and engaged in commerce through the Uber App while the app was in an unreasonably dangerous condition for the Uber drivers.

191.    The Uber Defendants designed and created the unreasonably dangerous Uber App by designing it in such a manner that the Uber App is dangerous beyond that which would be contemplated by the ordinary buyer/user who purchases/uses the product.

192.     The Uber Defendants expected the Uber App to be used by the Uber drivers without a substantial change in condition.

193.     The unreasonably dangerous and defective conditions of the Uber App were present when the app left the Uber Defendants' possession and was downloaded by Uber drivers, including Defendant Ayari.

194.     The Uber App was unreasonably dangerous to an extent beyond that which would be contemplated by the ordinary buyer who purchased the product in that it required drivers, including Defendant Ayari, to operate a cellular phone with the Uber App open to respond to messages through the Uber App while driving, in violation of D.C. Code §50–1731.01 et seq.

195.     The Uber App was unreasonably dangerous to an extent beyond that which would be contemplated by the ordinary buyer who purchased the product in that it directed Defendant Ayari to travel the wrong way down Maine Avenue as described above.

196.     Defendant Ayari was using the Uber App on the day of the incident without a substantial change in condition from the way the Uber Defendants had designed the app.

197.     Defendant Ayari was using the Uber App in substantially the way that the Uber Defendants intended the Uber mobile app to be used.

198.     The Uber Defendants also did not provide adequate warnings of the risks involved with the use of the Uber App by drivers to their customers for the unreasonably dangerous conditions. Through advertising in the general media, digital advertising, publications, and other forms of promotion, the Uber Defendants continuously and wrongfully promoted Uber as a safe rider experience.

199.     The unreasonably dangerous and defective conditions described above were direct and proximate causes of the subject collision and the damages pled below.

## COUNT VII

### Manufacturer/Seller's Liability for Negligent Design of Product

Carroll Walker v. Uber Technologies, Inc. and Rasier, LLC

200. Plaintiff re-pleads and incorporates by reference paragraphs No. 1 through No. 199 of this Complaint fully as if the allegations were set forth fully herein and further states:

201. That at all times relevant, the Uber Defendants owned, operated, designed, and otherwise controlled the Uber App.

202. At all times relevant, the Uber Defendants owned, operated, designed, and otherwise controlled the electronic notifications and messages sent to Uber drivers, such as Defendant Ayari, through the Uber App.

203. At all times relevant, the Uber Defendants were regularly engaged in the business of distributing the Uber App to drivers and regularly engaging in commerce through transactions on the Uber App with both riders and drivers.

204. The Uber Defendants distributed and engaged in commerce through the Uber App while the Uber App was in an unreasonably dangerous condition for the Uber drivers.

205. The unreasonably dangerous and defective condition of the Uber App was present when the Uber App left the Uber Defendants' possession and was downloaded by Uber drivers, including Defendant Ayari.

206. The Uber Defendants expected the Uber App to be used by the Uber drivers without a substantial change in condition.

207. Defendant Ayari was using the Uber App on the day of the incident without a substantial change in condition from the way the Uber Defendants had designed the app.

208. Defendant Ayari was using the Uber App in substantially the way that the Uber Defendants intended the Uber App to be used.

209.    At all times relevant, the Uber Defendants knew that certain electronic notifications and communications required or incentivized prompt responses, such as future ride requests.

210.    At all times relevant, the Uber Defendants directed, mandated, requested, and/or incentivized Uber drivers, such as Defendant Ayari to use and keep open the Uber App and promptly respond to electronic notifications and communications while driving in the District of Columbia.

211.    The Uber Defendants knew of or should have known of a feasible way to use a different design, which would have made the Uber App safer for drivers to use.

212.    An ordinary customer would have expected Uber to use this safer, feasible design instead of the design the Uber Defendants used, which posed a serious danger due to the design defects, including incentivizing drivers to operate the app while their car is moving, in violation of D.C. Code §50–1731.01 et seq., and providing distracting, confusing, and misleading directions to the Uber drivers causing them to drive while distracted.

213.    The Uber Defendants had a duty to the public, and specifically to customers and consumers like the Plaintiffs, to design and create the Uber mobile app:

    a.  in a reasonably safe manner;

    b.  in a manner that meets the standard established by law for the protection of others against reasonably great risk of harm;

    c.  in a manner safe for uses that would be contemplated by the ordinary buyer/user who purchases/uses the product;

    d.  in a manner using safer design alternatives which were economically feasible and technologically available;

e.  in a manner that did not repeatedly distract drivers, like Defendant Ayari, from their driving by taking their eyes/attention off the roadway while driving and having a tendency to create unsafe driving conditions;

f.  in a manner involving function and safety choices that would have prevented its use and operation while Uber drivers were simultaneously operating a motor vehicle;

g.  in a manner that would have prevented the Uber App from providing inaccurate, dangerous, confusing, and/or distracting driving directions which impaired drivers' driving ability and led to an increased risk of a crash; and

h.  in a manner where the danger from the product was not outweighed by the costs of avoiding the danger from the product.

214.  The Uber Defendants breached this duty by designing and creating the Uber mobile app in the following ways:

a.  by designing and creating the Uber mobile app in an unreasonably dangerous manner;

b.  by designing and creating the Uber mobile app in a manner that falls below the standard established by law for the protection of others against reasonably great risk of harm;

c.  by designing and creating the Uber mobile app in such a manner that it is dangerous beyond that which would be contemplated by the ordinary buyer/user who purchases/uses the product;

d.  by designing the Uber App in a manner that repeatedly distracted drivers, like Defendant Ayari, from their driving by taking their eyes/attention off the roadway while driving and having a tendency to create unsafe driving conditions;

e.   by designing the Uber App to include function and safety choices that did not prevent its use and operation while Uber drivers were operating a motor vehicle;

f.   by failing to integrate various components into the Uber App that would reasonably protect Uber App users (both drivers and passengers) and the general public while the Uber App was being used in a reasonably foreseeable manner;

g.   by designing the Uber App in a manner that provided inaccurate, dangerous, confusing and/or distracting driving directions which impaired drivers' driving ability and led to an increased risk of a crash, and by providing directions to the Uber vehicle driven by Ayari to drive the wrong way down a one-way street; and

h.   by designing and creating the Uber mobile app in a manner where the danger from the product was outweighed by the costs of avoiding the danger from the product.

215.   The unreasonably dangerous design of the Uber App by the Uber Defendants was a direct and proximate cause of the subject collision and the damages pled below.

## COUNT VIII

### Manufacturer/Seller's Liability for Failure to Warn

Carroll Walker v. Uber Technologies, Inc. and Rasier, LLC

216.   Plaintiff re-pleads and incorporates by reference paragraphs No. 1 through No. 215 of this Complaint fully as if the allegations were set forth fully herein and further states:

217.   That at all times relevant, the Uber Defendants owned, operated, designed, and otherwise controlled the Uber App.

218.   At all times relevant, the Uber Defendants owned, operated, designed, and otherwise controlled the electronic notifications and messages sent to Uber drivers, such as Defendant Ayari, through the Uber App.

219.    At all times relevant, the Uber Defendants were regularly engaged in the business of distributing the Uber App to drivers and regularly engaging in commerce through transactions on the Uber App with both riders and drivers.

220.    At all times relevant, the Uber Defendants knew that certain electronic notifications and communications required or incentivized prompt responses, such as notifications of future ride requests.

221.    At all times relevant, the Uber Defendants directed, mandated, and/or incentivized Uber drivers, such as Defendant Ayari to use and keep open the Uber App and promptly respond to electronic notifications and communications while driving in the District of Columbia.

222.    The Uber Defendants knew of or should have known that a foreseeable harm such as passenger injuries from automobile accidents would occur from designing the Uber App in such a way to incentivize behavior in violation of D.C. Code §50–1731.01 et seq. and/or provided inaccurate, dangerous, confusing, and/or distracting directions to Uber drivers.

223.    Despite this knowledge, the Uber Defendants failed to provide any warnings regarding the foreseeable harms based on the defective design of the Uber App to Uber drivers or passengers, including that use of the Uber App while driving would provide inaccurate, dangerous, confusing, and/or distracting driving directions leading to an increased risk of a vehicle crash.

224.    Despite this knowledge, the Uber Defendants advertised their Uber App and services as safe without providing proper warnings of the safety problems and issues.

225.    Despite this knowledge, the Uber Defendants did not provide warnings that adequately advised of the risks of using the Uber App that might not be obvious to the users.

226.    Despite this knowledge, the Uber Defendants failed to provide any specific instructions or adequate information for the safe use of the Uber App while being an Uber Driver or passenger, including any warnings that use of the Uber App while driving would provide

inaccurate, dangerous, confusing, and/or distracting driving directions leading to an increased risk of a vehicle crash or how to avoid this increased risk of a crash.

227.    The failure to warn of the foreseeable dangers of accepting a ride using the Uber mobile app and riding in an Uber vehicle while the driver operates the Uber App was a direct and proximate cause of the subject collision and the damages pled below.

## COUNT IX
## Negligence Per Se - Statutory Violations
### Carroll Walker v. All Defendants

228.    Plaintiff re-pleads and incorporates by reference paragraphs No. 1 through No. 227 and all Counts above of this Complaint fully as if the allegations were set forth fully herein and further states:

229.    That at all times relevant, the Uber Defendants owned, operated, designed, and otherwise controlled the Uber App.

230.    At all times relevant, the Uber Defendants owned, operated, designed, and otherwise controlled the Uber App messages sent to Uber drivers, such as Defendant Ayari.

231.    At all times relevant, the Uber Defendants know that certain electronic notifications and communications required or incentivized prompt responses, such as notifications of future ride requests.

232.    At all times relevant, the Uber Defendants directed, mandated, and/or incentivized Uber drivers, such as Defendant Ayari to use and keep open the Uber App while driving in the District of Columbia.

233.    At all times relevant, the Uber Defendants were engaged in the business of distributing the Uber App to drivers and engaging in commerce through transactions on the Uber App with both riders and drivers.

234.    The Uber Defendants distributed and engaged in commerce through the Uber App while the app was designed to be operated while drivers were driving motor vehicles in the District of Columbia.

235.    The District of Columbia banned the use of cellular phones and other mobile devices, including composing, sending, receiving, or reading a written message or image on mobile devices under D.C. Code §50–1731.01 et seq.

236.    The District of Columbia specifically passed this law to prohibit distracted driving, which is defined as "inattentive driving while operating a motor vehicle that results in the unsafe operation of the vehicle where such inattention is caused by reading, writing, … using personal communications technologies, or engaging in any other activity which causes distractions." D.C. Code §50–1731.02(1).

237.    D.C. Code §50–1731.01 et seq. was implemented to protect individuals using or near the roadways from sustaining injuries or death due to inattentive or distracted drivers.

238.    Plaintiff Carroll Walker, as a passenger in a motor vehicle on the roadway at the time of this accident, was in the class of persons whom these laws were designed to protect.

239.    Each Defendant owed a duty to conduct their affairs in accordance with D.C. Code §50–1731.01 et seq.

240.    Each Defendant breached one or more of the duties established by D.C. Code §50–1731.01 et seq. as described above.  Such conduct constitutes negligence per se.

241.    The Negligence Per Se of the Defendants described above was a direct and proximate cause of the subject collision and the damages pled below.


**<u>DAMAGES</u>**

242. As a direct and proximate result of all of the Defendants' conduct above and their actions and omissions as described in Counts I-IX above, Plaintiff Carroll Walker has suffered and will continue to suffer immense physical pain resulting from serious bodily injuries past, present, and future, which are permanent, mental anguish, emotional distress, loss of sexual health, past, present and future medical expenses and aide and attendant expenses, past, present, and future lost wages and benefits, deformity, disfigurement, loss of both of his lower limbs above the knee, as well as past, present, and future inconvenience, loss of enjoyment of life, embarrassment, and other related and attendant damages.

## COUNT X
### Loss of Consortium
Cheryl Walker v. All Defendants

243. Plaintiff re-pleads and incorporates by reference paragraphs No. 1 through No. 242 of this Complaint fully as if the allegations were set forth fully herein and incorporates all liability Counts above in her claims and further states:

244. On the date of the collision, March 18, 2021, Plaintiffs Cheryl and Carroll Walker had been happily married for over 26 years.

245. For all of the years of their marriage, Plaintiffs Cheryl and Carroll Walker lived in the same house and shared all of the joys, love, companionship, society, conjugal fellowship, and sexual intimacies usual and customary between husband and wife. They enjoyed each other's company and formed a deep intimate bond.

246. As a result of the negligence of each defendant described in Counts I-IX of this Complaint, Carroll Walker suffered significant physical and mental injuries, has not been able to return to the home that he and Cheryl share, and has not been able to keep up with the usual and customary intimacies of a husband and wife.

247.    As a direct and proximate result of this loss of consortium, Plaintiff Cheryl Walker sustained severe injuries. Plaintiff Cheryl Walker has suffered and will continue to suffer loss of material services as well as love, affection, companionship, society, assistance, conjugal fellowship, the loss or impairment of sexual relations, and other damages for matters generally associated with a marital relationship.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief: Judgment in favor of Cheryl Walker, Power of Attorney for Carroll Walker for a personal injury action pursuant to Counts I-IX and against Defendant Ayari, Defendant Uber Technologies, Inc. and Defendant Rasier, LLC, jointly and severally, for compensatory damages and for such other amounts permitted by law, and for Cheryl Walker for a loss of consortium action pursuant to Count X of and against Defendant Ayari, Defendant Uber Technologies, Inc. and Defendant Rasier, LLC, jointly and severally, in the amount of two hundred and fifty million dollars ($250,000,000.00) for compensatory damages and for such other amounts permitted by law, as well as interest from March 18, 2021, and attorneys' fees and costs, and for such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in the above-captioned matter on all issues properly tried before a jury.

Respectfully submitted,

David E. Haynes
DC Bar No. 483119
The Cochran Firm, D.C., PLLC
1666 K Street, N.W.
Suite 1150
Washington, D.C. 20006
Telephone: (202) 682-5800
Fax: (202) 408-8851
dhaynes@cochranfirm.com
Attorney for Plaintiffs

Dated:  December 21, 2023