UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CHERYL WALKER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UBER TECHNOLOGIES, INC., et. al. )<br>)<br>Defendants. )<br>) | Case No. 23-cv-3796 (APM) |

MEMORANDUM OPINION AND ORDER

**I.**

Plaintiff Cheryl Walker, as Power of Attorney for her husband, Carroll Walker, brings this action against Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-DC, LLC arising from a car accident that occurred in March 2021, during which Carroll was a passenger in an Uber ride ordered by Cheryl. In this action, Cheryl asserts a host of tort claims on behalf of Carroll and a loss of consortium claim of her own. Defendants move to compel arbitration, asserting that the Walkers' claims are subject to an arbitration clause in Uber's Terms of Use. For the reasons that follow, Defendants' motion is denied as to Carroll's claims but granted as to Cheryl's loss of consortium claim.

**II.**

Defendant Uber Technologies, Inc. is a technology company that develops and maintains "digital multi-sided marketplace platforms," including its "Rides platform" that "connect[s] riders with independent drivers." Uber Tech., Inc., Rasier, LLC, & Raiser-DC, LLC's Mot. to Compel Arb. & to Dismiss or Stay the Action Pending the Completion of Arb., ECF No. 9 [hereinafter

Defs.' Mot.], Decl. of Todd Gaddis in Supp. of Defs.' Mot., ECF No. 9-2, ¶ 4 [hereinafter Gaddis Decl.]. Defendant Rasier, LLC is a wholly owned subsidiary of Uber, and Defendant Rasier-DC, LLC is a wholly owned subsidiary of Rasier, LLC. Gaddis Decl. ¶ 5. Rasier is "engaged in the business of providing lead generation services for independent ridesharing transportation providers." *Tyler v. Uber Techs., Inc.*, No. 19-cv-3492 (ABJ), 2020 WL 5569948, at *2 (D.D.C. Sept. 17, 2020) (internal quotation marks omitted).

To utilize Uber's platforms, a user must first create an account and agree to the Terms of Use ("Terms"). Gaddis Decl. ¶ 6. When Uber amends its Terms, users are presented with an in-app pop-up screen alerting them to the updated Terms, which blocks access to the app until the user accepts the new Terms. *See id.* ¶¶ 7–8. In short, users must affirmatively agree to the amended Terms to continue using the app. *See id.*

### A.

Cheryl Walker registered as a rider on the Uber app using her iPhone in August 2017. Gaddis Decl., Ex. B, ECF No. 9-3, at 4 [hereinafter Ex. B].[1] Subsequently, Cheryl twice agreed to updated Terms through an in-app pop-up screen. Gaddis Decl. ¶¶ 8–12. The image below depicts a "true and accurate copy of a representation of the in-app blocking pop-up screen." Gaddis Decl. ¶ 8.

---

[1] Page citations to the exhibits attached to the Gaddis Declaration are to the CM/ECF-generated page numbers.



Gaddis Decl., Ex. A, ECF No. 9-3, at 2 [hereinafter Ex. A].

  Both times the pop-up screen appeared with a header titled "We've updated our terms." Text stating "We encourage you to read our Updated Terms in full" appeared in large black font in the middle of the screen. Gaddis Decl. ¶ 8. Underneath were two bullet points, "Terms of Use" and "Privacy Notice," displayed as blue hyperlinks. *Id*. Clicking the hyperlink would take a user

3

to the relevant page on Uber's website. *Id.* The bottom of the pop-up screen contained a checkbox next to two sentences: "**By checking the box, I have reviewed and agree to the Terms of Use and acknowledge the Privacy Notice.**" and "I am at least 18 years of age." Ex. A. Immediately below that text, the user was presented with a "Confirm" button. *Id.* Uber's records indicate that "Cheryl Thompson Walker" both clicked the checkbox and tapped "Confirm" on February 12, 2021, and April 6, 2022. Gaddis Decl. ¶ 12; Ex. B at 4.

Cheryl does not dispute that she clicked "Confirm" on the pop-up screen presented to her. Instead, she states that she "ha[s] never read through Uber's terms and conditions [nor] was made aware of any specific terms and conditions." Pls.' Mem. of L. in Opp'n to Defs.' Mot., ECF No. 15 [hereinafter Pls.' Opp'n], Aff. of Cheryl Walker, ECF No. 15-2, ¶ 6 [hereinafter Cheryl Walker Aff.].

Uber's January 18, 2021, Terms of Use, which were in effect at time of the ride at issue, contain an arbitration clause that reads as follows:

> By agreeing to the Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration as set forth in this Arbitration Agreement. . . . [Y]ou and Uber agree that any dispute, claim or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof, (ii) your access to or use of the Services at any time, (iii) incidents or accidents resulting in personal injury that you allege occurred in connection with your use of the Services, whether the dispute, claim or controversy occurred or accrued before or after the date you agreed to the Terms, or (iv) your relationship with Uber, will be settled by binding arbitration between you and Uber, and not in a court of law.

Gaddis Decl., Ex. C, ECF No. 9-3, at 29 [hereinafter Jan. 2021 Terms].

The arbitration clause purports to bind not only the user, but third parties as well. The clause specifically identifies "spouses" as among those covered by the agreement.

4

> This Arbitration Agreement shall be binding upon, and shall include any claims brought by or against any third-parties, including but not limited to your *spouses*, heirs, third-party beneficiaries and assigns, where their underlying claims are in relation to your use of the Services. To the extent that any third-party beneficiary to this agreement brings claims against the Parties; those claims shall also be subject to this Arbitration Agreement.

*Id.* (emphasis added).  Regarding these arbitration terms, Cheryl Walker declares that she "never agreed to waive [her] or anyone else's right to a jury trial when using Uber vehicles and was not aware that any such waiver was contained therein." Cheryl Walker Aff. ¶ 6.

As part of its rideshare offerings, Uber allows users to request and pay for rides for others. *See* Gaddis Decl. ¶ 14.  To request a trip on behalf of a guest, a user must provide the guest's name and telephone number.  *See id*. ¶ 15.  Carroll Walker never had his own Uber account but occasionally took guest rides ordered through his wife's account.  Pls.' Opp'n, Aff. of Carroll Walker, ECF No. 15-1, ¶¶ 1, 6 [hereinafter Carrol Walker Aff.].

On March 18, 2021, Cheryl ordered a ride for Carroll through the Uber app. Compl., ECF No. 1, ¶¶ 91–92.  The Walkers allege that during this ride the Uber app "appeared to have instructed [the driver] to drive illegally into oncoming traffic down the wrong way on the roadway and to later make an illegal left-hand turn." *Id.* ¶ 107.  The result was a head-on collision that left Carroll with "catastrophic physical injuries." *Id.* ¶¶ 126, 128.

The March 18 ride was not the first ride that Cheryl had ordered for her husband.  Over a 28-month period starting on October 21, 2018, Cheryl requested six rides on behalf of her husband, the last of which ended in the accident. Gaddis Decl., Ex. E, ECF No. 9-3, at 69.  Before each of these rides (including the last one), Uber sent Carroll a text message referencing its Terms.  The one sent on March 18, 2021, stated:

> Your Uber from Cheryl is arriving in 10 minutes.\n \nBy taking this trip, you agree to the Uber Terms of Use & Privacy Policy:

> t.uber.com/lgl.\n \nChevrolet Captiva \n1EJ6584\n \nDriver George\n+12023018948\n \nCheryl is paying for your trip.\n \nTrack here\nhttps://trip.uber.com/Wu8vBbIYEf3A\n\nReply STOP to opt out from SMS notifications.

Gaddis Decl. ¶ 17; Gaddis Decl., Ex. D, ECF No. 9-3 at 66. The message "contained a bright blue underlined hyperlink to the Terms of Use & Privacy Policy." The "recipient has the option to click the underlined hyperlink, and if clicked, the Terms of Use or Privacy Notice, that were published on Uber's website respectively, were displayed." Gaddis Decl. ¶ 17.

According to Carroll, he "do[es] not read or reply to text messages," Carroll Walker Aff. ¶ 7, so he "did not see or read any text messages from Uber regarding their terms and conditions," *id*. ¶ 2. He thus was "unaware that any such messages had been sent" before any of the Uber rides ordered by Cheryl. *Id*. ¶ 3.

**B.**

On December 21, 2023, Cheryl filed the instant suit. Compl. The complaint asserts several negligence and tort claims on behalf of Carroll, as well as a loss of consortium claim on behalf of Cheryl. *See generally* Compl. at 21–43. Defendants (collectively referred to as "Uber") then filed the instant motion to compel arbitration. Defs.' Mot.[2]

**III.**

Courts consider motions to compel arbitration as "a request for summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Aliron Int'l, Inc. v. Cherokee Nation Indus.*, 531 F.3d 863, 865 (D.C. Cir. 2008) (cleaned up). "Although a motion to compel arbitration is similar to a motion for summary judgment in framing

---

[2] The complaint also identified as a defendant George Ayari, who was the driver assigned to the March 18 Uber ride at issue. Compl. at 1–2. Defendant Ayari filed a motion to dismiss for lack of subject-matter jurisdiction based on the absence of complete diversity of the parties, ECF No. 22, as did Uber, ECF No. 21. The Walkers ultimately settled their dispute with Defendant Ayari, ECF No. 24; consequently, Uber withdrew its motion to dismiss, ECF No. 25.

the burden of proof, the two motions are of course not identical." *Jin v. Parsons Corp.*, 966 F.3d 821, 827 (D.C. Cir. 2020). Notably, in considering a motion to compel arbitration, the court must consider arbitrability at the outset of litigation; it "cannot postpone deciding the question of arbitrability *vel non* and allow the case to proceed on the merits." *Id.*

"Because the party seeking to enforce an arbitration agreement bears the burden of proving that the other party agreed to arbitrate, the party seeking to compel arbitration must first present evidence sufficient to demonstrate an enforceable agreement to arbitrate." *Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 9 (D.D.C. 2021) (internal citations and quotation marks omitted). "The burden then shifts to the non-moving party to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Rule 56." *Id.* (internal citations and quotation marks omitted). "The court must grant summary judgment with respect to the formation of an arbitration agreement if the pleadings and the evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (internal citations and quotation marks omitted). But if the court concludes that a "genuine dispute of material fact exists as to the making of the arbitration agreement, including whether the parties assented to the agreement," the case must "proceed summarily to trial solely on the issue of arbitrability." *Jin*, 966 F.3d at 827 (internal quotations omitted).

### IV.

### A.

The court first considers Uber's threshold argument that, because the "parties 'clearly and unmistakably' demonstrate[d] their intent to have the arbitrator decide arbitrability," the enforceability challenges raised by the Walkers must be resolved by the arbitrator, not the court.

Defs.' Mot., Defs.' Mem. of L. in Supp. of Defs.' Mot, ECF No. 9-1 [hereinafter Defs.' Mem.], at 15–16.  Uber points to the following text in the Terms updated on January 18, 2021:

> The Arbitrator shall also be responsible for determining all threshold arbitrability issues, including issues relating to whether the Terms are applicable, unconscionable or illusory and any defense to arbitration, including waiver, delay, laches, or estoppel.  If there is a dispute about whether this Arbitration Agreement can be enforced or applies to a dispute, you and Uber agree that the arbitrator will decide that issue.

Jan. 2021 Terms at 30.  That provision, commonly referred to as a delegation clause, Uber says, "explicitly outline[s] the clear delegation of authority to the arbitrator to determine threshold issues."  Defs.' Mem. at 16.

This argument fails as to Carroll's claims.  The Supreme Court consistently has held that "whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943−46 (1995); *see Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."); *see also Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 n.2 (2010) ("The issue of the agreement's validity  is different from the issue whether any agreement between the parties was ever concluded.") (internal citation and quotation marks omitted).  In *First Options of Chicago, Inc. v. Kaplan*, the Court held that the question of whether third parties who had not signed the arbitration contract were nevertheless bound by it was "subject to independent review by the courts."  514 U.S. 938, 947 (1995).  Because Carroll contests that there is any enforceable arbitration agreement between Uber and him, that question must be resolved by the court.

The court reaches a different conclusion as to Cheryl's loss of consortium claim.  Although that claim is "derivative" of her husband's, it "remains an independent action eligible for an

independent recovery." *John Crane, Inc. v. Puller*, 899 A.2d 879, 932 (Md. Ct. Spec. App. 2006).[3] The claim therefore belongs to Cheryl. By accepting Uber's Terms, she agreed to the arbitration agreement, including the delegation clause. *See* Jan. 2021 Terms at 8; *Henry Schein, Inc.*, 586 U.S. at 69 ("Parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence."). Cheryl is thus bound by the agreement to have an arbitrator determine the arbitrability of her claim.

Cheryl makes two arguments challenging the validity of the arbitration agreement. First, she asserts "whether Uber's interface provided Cheryl with adequate notice of the 2021 Terms is a question of fact that should not be determined on summary judgment." Pls.' Opp'n at 23. The court disagrees. Although the record does not indicate how the Terms were presented to Cheryl when she originally signed up for an Uber account, it does establish that, through an in-app pop-up screen, Cheryl agreed to Uber's updated Terms in 2021 and 2022. Each of those Terms contained an arbitration clause. Gaddis Decl. ¶¶ 8, 12, Exs. A & B. That is enough under District of Columbia law to establish a "clear and unmistakable" agreement to arbitrate between Cheryl and Uber. *See Selden v. Airbnb, Inc.*, 4 F.4th 148, 156–57 (D.C. Cir. 2021) (finding that an online sign-in whose text was "conspicuous" was sufficient to create a valid agreement to arbitrate under California law); *Gambo v. Lyft, Inc.*, 642 F. Supp. 3d 46, 49–50 (D.D.C. 2022) (holding under District of Columbia law that customer was bound by arbitration clause accepted through mobile prompts similar to those used by Uber here).

Cheryl does not deny accepting Uber's updated Terms. Instead, she avers that she "never read through Uber's terms and conditions" and "was not aware that any [] waiver [of her right to

---

[3] Under District of Columbia choice-of-law principles, a loss of consortium claim is "governed by 'the law of the state where the marriage is domiciled' rather than the law of the state where the wrong occurred." *Price v. Stryker Corp.*, 270 F. Supp. 3d 226, 231 (D.D.C. 2017) (quoting *Cardenas v. Muangman*, 998 A.2d 303, 312 (D.C. 2010)). For that reason, the court relies on the law of Maryland, which is where Cheryl and Carroll live. Compl. ¶¶ 1–2.

jury trial] was contained therein." Cheryl Walker Aff. ¶ 6. But "[t]he general rule is that absent fraud or mistake, one who signs a contract is bound by a contract which he has an opportunity to read whether he does so or not." *Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1010 (D.C. 2002) (internal quotation marks and citation omitted). Because a reasonable consumer reading the Terms "would have inevitably discovered the [arbitration] clause," Cheryl "was provided adequate notice" of it. *Id.* at 1010–11. By accepting the Terms, she agreed to arbitrate claims arising from her use of the Uber ridesharing service. *See id.* (enforcing a forum selection clause against a plaintiff who pressed "[a]ccept" at the end of a subscriber contract presented in a "scroll box" on a computer monitor, which in print was 13 pages long). The various out-of-Circuit cases that Cheryl cites therefore carry no weight. Pl.'s Opp'n at 24–27.[4]

Second, Cheryl contests the arbitration agreement on the grounds that it is unconscionable under District of Columbia law. Pl.'s Opp'n at 27–28. But that challenge does not allow Cheryl to avoid an arbitrator. Under Supreme Court precedent, a delegation clause is severable from the remainder of the agreement to arbitrate. *See Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1194 (2024); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). The validity of the delegation provision must be challenged "specifically" for it to be treated as an "antecedent" question for the court's consideration. *See Rent-A-Center West*, 561 U.S. at 72 (holding that unless the plaintiff "challenged the delegation provision specifically, we must treat it as valid under § 2 [of the Federal Arbitration Act], and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator"). Here, Cheryl does not separately challenge the

---

[4] Cheryl asserts that the court should deny the motion because discovery is necessary to determine the adequacy of the notice provided by the Uber interface. Pl.'s Opp'n at 27. That request is denied because Cheryl fails to follow the procedure outlined by the D.C. Circuit in *Convertino v. U.S. Department of Justice*, for seeking additional discovery under Rule 56(d) to defer a ruling on a motion for summary judgment. 684 F.3d 93, 99 (D.C. Cir. 2012) (requiring a party to supply an affidavit or declaration, which states "with sufficient particularly why additional discovery is necessary") (cleaned up). *See also Aliron Int'l*, 531 F.3d at 865 (stating that the district court "properly examined" a motion to compel arbitration under the Rule 56(c) summary judgment standard).

10

delegation clause. Rather, she contests the arbitration agreement *as a whole*. *See id.* at 28 ("Here, the arbitration clause is both procedurally and substantively unconscionable."). Accordingly, the question of whether the agreement to arbitrate is unconscionable as to her loss of consortium claim is one for the arbitrator to resolve, not the court. *See id.*

### B.

The court turns now to the arbitrability of Carroll's claims. Uber offers two contentions to argue that his claims are subject to arbitration. First, it argues that it sent Carroll a text message before the ride that contained a hyperlink to the Terms, and Carroll manifested his assent to the Terms, including the arbitration clause, by accepting the Uber ride. Second, it contends that Carroll is a third-party beneficiary to the contract between Cheryl and Uber and is therefore bound by the arbitration agreement. Neither argument is persuasive.

### 1.

The court's first task is to "determine[] whether a valid arbitration agreement exists" between Carroll and Uber. *Henry Schein, Inc.*, 139 S. Ct. at 530. State contract law governs that question. *See Selden*, 4 F.4th at 156. The parties agree that District of Columbia law is controlling. Defs.' Mem. at 20; Pls.' Opp'n at 6. Under District of Columbia law, a contract is enforceable where there is "(1) an agreement to all material terms, and (2) intention of the parties to be bound." *EastBanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1002 (D.C. 2008) (cleaned up). The party asserting the existence of a contract bears the burden of proof. *See Jack Baker, Inc. v. Off. Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995). The only dispute here pertains to the second element: whether Uber and Carroll mutually intended to be bound by Uber's Terms, including the arbitration agreement.

The formation of a contract requires "'mutual assent by the parties to the terms thereof.'" *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995) (quoting *Klein v. Weiss*, 395 A.2d 126, 141 (Md. 1978)). Mutual assent of a contract is "often referred to as a 'meeting of the minds.'" *Id.* Whether there was a "meeting of the minds" "requires a probing inquiry into the understanding of each party to the alleged contract regarding its meaning and effect." *Howard Univ. v. Lacy*, 828 A.2d 733, 737 (D.C. 2003). That includes "the parties' actions at the time of contract formation." *Ekedahl v. COREStaff, Inc.*, 183 F.3d 855, 858 (D.C. Cir. 1999). A party's signature to an agreement—or here, a click—is not essential. "When the parties to a contract set forth the terms of their agreement in writing and manifest in some manner a clear intent to be bound, the absence of one party's signature on the written agreement will not defeat or invalidate the contract" if assent can otherwise be established by the parties' conduct. *Davis*, 664 A.2d at 838. Because the "ultimate issue when it comes to mutual assent is whether the parties objectively manifested their intent to be bound contractually, the intentions of parties to a contract can be found from written materials, oral expressions and the actions of the parties." *Apprio, Inc. v. Zaccari*, 104 F.4th 897, 907 (D.C. Cir. 2024) (cleaned up).

Applying these principles, the court cannot find that Carroll and Uber had a "meeting of the minds" as to the Terms, including the agreement to arbitrate. Carroll never had an Uber account. He therefore was never asked to assent to Uber's Terms by checking a box or pressing a "Confirm" button. Likewise, Uber did not condition *his* use of the rideshare service on *his* acceptance of the Terms through some affirmative act. For instance, Uber did not ask Carroll to click or confirm the Terms before dispatching a ride to him. Carroll thus never electronically "signed" an agreement with Uber.

Uber, for its part, responds that the absence of an affirmative acknowledgment and acceptance of the Terms by Carroll is not dispositive. It relies on Carroll's receipt of a text message from Uber containing the Terms prior to his ride and his acceptance of the ride as proof of his assent. It specifically points to that portion of the text message stating, "By taking this trip, you agree to the Uber Terms of Use & Privacy Policy," and the embedded hyperlink to the January 2021 Terms. Uber adds that Carroll's taking of six prior rides ordered by Cheryl and his receipt of similar text messages before each such ride confirms his assent to the Terms. Defs.' Mem. at 21–22.

The court is unpersuaded. Courts have enforced various types of online agreements. *See Selden v. Airbnb, Inc.*, No. 16-cv-00933 (CRC), 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016) (describing "browsewraps," "clickwraps," "scrollwraps," and "sign-in-wraps"), *aff'd*, 4 F.4th 148. Agreements known as "clickwraps" or "sign-in wraps" require the user to take some affirmative act to acknowledge and accept the terms of use, like a click or sign in. As to such agreements, the question typically for a court is whether the manner of the terms' presentation put the user on notice that their action manifested their intent to be bound by those terms. *See Selden*, 4 F.4th at 152 (involving sign-in wrap agreement); *see also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (stating that a valid internet contract is formed where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms").

Courts also have recognized "browsewrap" agreements, which do not require a user to take an affirmative act to be bound to the merchant's terms. A "browsewrap" agreement is one in which the platform makes its terms available to users through a hyperlink, and the user manifests assent

to those terms by browsing the site. *See Oberstein*, 60 F.4th at 513; *Selden*, 2016 WL 6476934, at *4. "Courts are generally reluctant to enforce such agreements because they often leave users unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Oberstein*, 60 F.4th at 513 (citation and internal quotation marks omitted).

Uber's contract theory in this case goes one step further. Uber does not contend that Carroll either expressly assented to Uber's Terms or that he directly interacted with the app in such a way as to infer that he did so. Instead, Uber argues that Carroll is subject to its Terms merely because he received the Terms by text message before the ride that Cheryl ordered on March 18 and then took the ride, and that before he had received similar text messages and had taken rides ordered by Cheryl. Defs.' Mem. at 21–22. The court presumes for present purposes that this novel theory can be sustained under District of Columbia law. To prevail, Uber must show, at a minimum, that Carroll was on sufficient "inquiry notice," or "constructive notice," of its Terms. *Selden*, 4 F.4th at 156 (applying California law to a sign-in wrap agreement). Such notice requires that the terms be presented to the user in a clear and conspicuous manner. *Cf. id.* at 157; *Oberstein*, 60 F.4th at 515 (stating that constructive notice under California law depends on "reasonably conspicuous notice of the terms to which the consumer will be bound").

Uber's notice to Carroll fails that test. The text message that Carroll received—reproduced below—is far from plain English. It is a mishmash of words, symbols, letters, and numbers, within which the hyperlink to the Terms was integrated.

> Your Uber from Cheryl is arriving in 10 minutes.\n \nBy taking this trip, you agree to the Uber Terms of Use & Privacy Policy: t.uber.com/lgl.\n \nChevrolet Captiva \n1EJ6584\n \nDriver George\n+12023018948\n \nCheryl is paying for your trip.\n \nTrack  here\nhttps://trip.uber.com/Wu8vBbIYEf3A\n\nReply  STOP  to  opt  out from SMS notifications.

To be fair, the hyperlink was presented in a complete sentence and was "bright blue" and "underlined," Gaddis Decl. ¶ 17, but the text message itself is not a "simple, streamlined design that sufficiently draws a user's attention to [Uber's] Terms of Service." *Selden*, 4 F.4th at 157.

Moreover, Uber also has failed to establish that Carroll would have been on notice that the text message contained a hyperlink to the Terms. *See Oberstein*, 60 F.4th at 515. Browsewrap agreements provide a helpful analogy. When considering such agreements, courts look to "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design in determining whether a reasonably prudent user would have inquiry notice." *Id.* (citation and internal quotation marks omitted). Uber's text message to Carroll displayed in order: (1) an eight-word sentence (plus a numeral) that provided notice that the ride was on the way; (2) two "n\"s, the meaning of which is not apparent; (3) a four-word introductory clause ("By taking this trip"); and (4) five additional words ("you agree to the Uber"). Only then did the hyperlinked text to the Terms appear. The preview of a text message on a mobile device usually consists of only a few lines. Given the structure of Uber's text message to Carroll, it is far from apparent that the hyperlinked Terms even would have been visible to him on the text message preview screen on his mobile device. *Compare Carter v. Ralph Lauren Corp.*, 683 F. Supp. 3d 400, 414−16 (S.D.N.Y. 2023) (finding that Ralph Lauren failed to show that the plaintiff agreed to hyperlinked arbitration clause contained in a text message that the plaintiff had not clicked), *with Thomas v. Cricket Wireless*, LLC, 506 F. Supp. 3d 891, 899, 908 (N.D. Cal. 2020) (holding, under Missouri law, that the plaintiff had constructive notice where the arbitration provision "was conspicuously stated in the substance of the text message[]" and the plaintiff had not "submit[ted] a declaration disclaiming" that he received and/or read the messages despite having an opportunity to do so).

Uber thus has not demonstrated that a preview of the text message would have signaled to Carroll that his Uber trip was subject to the Terms. His mere receipt of them via text message is not enough to establish that he was on inquiry notice. *See Quamina v. JustAnswer LLC*, No. 22-cv-6051 (JD), 2024 WL 950157, at *7 (N.D. Cal. Mar. 5, 2024) ("Assuming plaintiffs received the text messages, they were not required to open them to use the service, and a reasonable user would think herself free to delete them. . . . A reasonably prudent user would not expect to be sent, over text message, a contract governing an internet transaction that in [his] mind has already occurred.") (cleaned up).

That Carroll took the ride his wife ordered, and had previously taken Uber rides as a guest, does not establish his assent to Uber's Terms. *See* Defs.' Reply Brief in Supp. of Defs.' Motion, ECF No. 19, at 6 [hereinafter Defs.' Reply]. "A party cannot unilaterally declare that they have an agreement with another without evidence that the two have communicated about its terms." *Lurk v. Fulton-Jones*, 287 A.3d 253, 261 (D.C. 2023) (citing Restatement (Second) of Contracts § 3 (Am. L. Inst. 1981)). Here, although Carroll accepted Uber rides ordered by Cheryl, Uber has not shown that it adequately communicated the Terms governing those services to him on March 18 or anytime earlier. As already discussed, Uber's transmittal of the Terms was not clear and conspicuous. Uber therefore has failed to establish that Carroll assented to arbitrate his claims.

### 2.

In the alternative, Uber argues that, even if it had no agreement with Carroll, the court should nevertheless find that he is an intended third-party beneficiary of Uber's agreement with Cheryl, thus making his claims "subject to arbitration." Defs.' Mem. at 26. As a user on the platform, Cheryl Walker agreed to the arbitration provision contained in Uber's Terms, which includes "any claims brought by or against any third parties, including but not limited to your

16

spouses . . . where [the] underlying claims are in relation to your use of the Services." *Id*. at 28. That language, according to Uber, reflects "the intent of the parties to bind" Carroll to the arbitration clause. *Id*. And because he "received a *direct* benefit flowing from [the] agreement," Carroll "should be estopped from refusing to arbitrate." *Id*. This argument finds no support under District of Columbia law.

"Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly the party urged to be a third-party beneficiary." *Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs., Ltd*., 902 F. Supp. 2d 87, 100 (D.D.C. 2012) (internal quotation marks and citation omitted). As this court has previously recognized, District of Columbia law permits a third-party beneficiary to enforce an arbitration clause against the contract's signatories "if the contracting parties intended for the third party to benefit directly from the contract." *Kelleher v. Dream Catcher, LLC*, 278 F. Supp. 3d 221, 224 (D.D.C. 2017).

But Uber cites no authority for the proposition that District of Columbia law permits a party to a contract to enforce an arbitration provision *against* a third-party beneficiary. In fact, courts in this District have read D.C. law to hold the opposite. *See, e.g.*, *Jones v. Quintana*, 872 F. Supp. 2d 48, 57 n.3 (D.D.C. 2012) ("Even assuming Defendants are correct that Plaintiff is an intended beneficiary, her status as such would only entitle Plaintiff to enforce the agreement against Defendants, not *vice versa*."); *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 179 (D.D.C. 2017) ("[E]ven if the Patriot League claimed third-party beneficiary status and the plaintiff and the University intended to benefit the Patriot League, the plaintiff would still be unable to pursue a breach of contract claim [against] it because the Patriot League would be the party that maintains the right to enforce the contractual obligations against the plaintiff and the University,

17

not vice versa."); *Guttenberg v. Emery*, 41 F. Supp. 3d 61, 68 (D.D.C. 2014) ("[P]laintiffs are seeking to enforce the contract against the non-party[], not the other way around.").

In any event, Uber cannot establish that Carroll was an intended third-party beneficiary to the contract between Cheryl and Uber. To determine if a person is a third-party beneficiary to a contract under District of Columbia law, courts must read the contract "as a whole to determine whether the third party's benefit . . . is intended or incidental." *Sakyi v. Estee Lauder Cos., Inc.*, 308 F. Supp. 3d 366, 384 (D.D.C. 2018) (internal quotation marks and citations omitted). Courts also consider factors such as "whether the nonparty clearly stood to benefit from the agreement at issue and whether the nonparty's involvement [was] plainly ascertainable from the four corners of the contract." *Id.* And the purported beneficiary must be identifiable from the contract's terms or the circumstances of its formation. *See id.*

Here, the "contract as a whole" does not contemplate a benefit to any party other than Cheryl and Uber. Jan. 2021 Terms at 28 ("By accessing or using the Services, you confirm your agreement to be bound by these Terms. If you do not agree to these Terms, you may not access or use the Services."). In fact, the Terms do not even mention as part of the "Services," or in any other portion, the ability of a user to order rides for others. Uber points to the arbitration provision, which purports to bind "spouses," as proof that Carroll is a third-party beneficiary. But that provision is not intended to benefit *Carroll*; it benefits only *Uber*. Uber cannot through the backdoor of an arbitration clause turn Carroll into a third-party beneficiary to the Terms that only Cheryl agreed to.

Uber points to an out-of-Circuit case, *Hamilton v. Uber Techs., Inc.*, where the court found that the plaintiff, a guest rider, was bound by his friend's arbitration agreement with Uber under a third-party beneficiary theory. No. 22-cv-6917 (PGG), 2023 WL 5769500, at *4-5 (S.D.N.Y. Sept.

18

7, 2023). *Hamilton* is distinguishable, however, because the plaintiff there previously had his own Uber account. Thus, it was "not a case where [the plaintiff] had no prior knowledge of Uber and its services." *Id*. at *5. The court explained that "[w]hile [the plaintiff] is bound by [his friend's] contractual agreement with Uber, [the plaintiff] previously entered into his own agreement with Uber." *Id*. The facts here are different: Carroll never had an Uber account and thus was not on notice of its terms like the plaintiff in *Hamilton*. Carroll Walker Decl. ¶¶ 7–9.[5]

## V.

Accordingly, the court denies Defendants' Motion to Compel Arbitration as to the claims brought on Carroll's behalf, but grants it as to Cheryl's loss of consortium claim. The court elects to stay the claim brought by Cheryl pending resolution of arbitration. *See Gambo*, 642 F. Supp. 3d at 56. Pursuant to § 16(a) of the Federal Arbitration Act, this order of denial is subject to interlocutory appeal as to Carroll's claims. *See* 9 U.S.C. § 16(a); *Jin*, 966 F.3d at 825.

Dated: September 11, 2024

Amit P. Mehta
United States District Court Judge

---

[5] The court expresses no opinion as to whether District of Columbia law would allow enforcement of an arbitration agreement on a third-party beneficiary theory on the facts of *Hamilton*.